57 CCPA
### Application of Fritz HOSTETTLER and William R. Proops.

**Patent Appeal No. 8283.**

United States Court of Customs and Patent Appeals.

Aug. 20, 1970.

Charles J. Metz, New York City, Paul A. Rose, Washington, D. C., Louis C. Smith, Jr., New York City, attorneys of record, for appellants.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before RICH, ALMOND, BALDWIN, and LANE, Judges, and ROSENSTEIN, Judge, United States Customs Court, sitting by designation.

LANE, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 1–3, 9 and 10 of application serial No. 509,427, filed November 23, 1965,[1] for "Stabilized Polyurethane Composition." We affirm.

The invention relates to a method of stablizing certain foamed polyurethane compositions against oxidative degradation occurring at elevated temperatures, as reflected in representative claim 1:

1. In a method for preparing urethane foams wherein a polyether polyol having a molecular weight of at least 250 and containing at least two active hydrogens as measured and determined by the Zerewitinoff method is reacted with an organic polyisocyanate in admixture with an organic tin catalyst and a blowing agent, the improvement which comprises providing in the reaction mixture a phenolic compound containing a polyhydroxyaryl radical in which at least two hydroxyl groups are directly attached to an aromatic nucleus in a vicinal position, which compound is provided in an amount of from about 0.001 to about 0.5 per cent by weight of said mixture, whereby said improvement imparts to said urethane foams enhanced resistance to degradation caused by said organic tin catalyst.

It appears from the specification that the advantages of using organic tin catalysts in polyurethane polymerization pro-

1. As a continuation-in-part of serial Nos. 293,903 and 24,644, filed July 9, 1963 and April 26, 1960, respectively.

cesses are offset to a certain extent by the fact that those catalysts tend "to promote deterioration" of polyether-based urethane foams at elevated temperatures of 130°C. occurring during the cure cycle, with concomitant loss of tensile strength, elongation and other desirable physical properties. The specification states:

> * * * it appears that the deterioration of polyether-based urethane foams at elevated temperatures is due to an oxidative degradation which results from an attack on polyether linkages by free radicals produced from the organic tin catalyst during the curing cycle of the foam. * * *

Appellants found that addition to the reaction mixture of certain amounts of phenolic compounds in which at least two hydroxyl groups are attached to the aromatic nucleus in a vicinal or adjoining position as recited in the claims, e.g., catechol and derivatives thereof, would effectively prevent deterioration of the foamed product and loss of desired physical characteristics.

The examiner rejected the claims under 35 U.S.C. 103 as obvious over Braun [2] in view of Mobay.[3] Braun discloses that polyurethane foams, prepared by reacting polyethers or polyesters with diisocyanates in the presence of a tertiary amine catalyst, can be stabilized against deterioration caused by light and oxidation by adding .05–10%, preferably 1–2%, of various polyhydroxyaryl derivatives (such as hydroquinone, catechol, and certain catechol derivatives) to the reaction mixture. Cured polyurethane foam samples stabilized in the above manner exhibited little or no color change, brittleness, or loss of strength when subjected to accelerated aging tests involving irradiation by a carbon arc lamp at 75°C. in a fadeometer for a day or more. Noting that Braun conducts his polymerization process in the presence of a tertiary amine catalyst rather than an organic tin catalyst, the examiner turned to Mobay, who discloses little more than what appellants acknowledge to be known in the art—namely, that certain organic tin compositions are suitable catalysts for the polymerization of polyethers with polyisocyanates to form polyurethane foam. The examiner held:

> The claimed subject matter is considered to be obvious to one skilled in the art in view of the teachings [of] Braun et al. and Mobay. It is evident, in view of the teachings of Braun et al., that polyurethane foams are subject [to] deterioration caused by light and oxidation. The foams of Mobay of course would be subject to the same type of deterioration. It is obvious that to prevent this deterioration in the Mobay foam one skilled in the art will use the phenolic stabilizers, e.g., catechol, of Braun et al.

The board agreed.

Appellants' principal argument here, as below, is that inasmuch as the prior art was unaware of the problem introduced by the use of organic tin catalysts in the polyether-based polyurethane polymerization process, it could not have suggested a solution thereto. They contend that the oxidative-degradation problem associated with and resulting from the use of organic tin catalysts during the foam curing cycle is a "special" one, and not akin to the general problem of heat- and light-induced deterioration and instability of cured polyurethane foams occurring in the presence of oxygen during accelerated aging and service use of the foam, as discussed and solved by Braun. As evidence of that, appellants' brief directs our attention to the Proops affidavit from which they quote:

> * · * * the use of D–22 [dibutyltin dilaurate—an organic tin compound] or similar tin compounds as one-shot catalysts seem to be mainly responsible for catalyzing the oxidative degradation of the foam. This was shown by

2. German Auslegeschrift No. 1,042,889, November 6, 1958.

3. A company publication entitled "A One Shot System for Flexible Polyether Urethane Foams", November 10, 1958.

the fact that a PPG–2025 [a polyether] foam prepared with triethylenediamine showed no deterioration after 1½ hours at 130°C. in air, but the addition of 0.05% D–22 [dibutyltin dilaurate] produced a foam which was weak on the exposed surfaces after the same treatment. * * *

Appellants also point out that the record shows that foams containing dibutyltin dilaurate were stable for one week in the presence of oxygen at a temperature of 70°C., near the temperature at which Braun conducted his aging tests.

It appears to have been the Patent Office position that, while the prior art may not have been expressly aware of the oxidative-degradation problem contributed by the tin catalyst disclosed by Mobay, it nevertheless would not be unexpected that the problem would exist, particularly in light of the fact that polyurethane foams produced by other processes were susceptible to oxidative degradation at elevated temperatures as shown by Braun. It also appear to have been the Patent Office position that Braun provided an obvious solution to the problem appellants found and first disclosed to exist in fact.

Appellants have failed to convince us of error in the Patent Office position. The existence of an oxidative degradation problem with foams prepared in the presence of organotin catalysts would have been apparent to one skilled in the art. While the particular mechanism of the degradation might not have been perceived, this does not mean that Braun did not suggest appellants' solution to the degradation problem. Braun utilized a variety of polyhydroxyaryl compounds, including catechol and derivatives thereof, to prevent oxidative deterioration of already-cured polyester- and polyether-based urethane foams prepared with tertiary amine catalysts in accelerated aging tests conducted at 75°C. Appellants utilize catechol and derivatives thereof to prevent oxidative degradation of polyether-based urethane foam reaction mixtures which occurs during the cure cycle at temperatures of 130°C., and

in the presence of organic tin catalysts. There is nothing in Braun indicating that catechol and its derivatives would not be effective in the environment in which appellants employ them, and appellants have not shown that their stabilizers yield unexpectedly different results as compared to the variety of phenolic compounds taught by Braun. While example 16 of the specification shows superiority over the use of one stabilizer taught by Braun, hydroquinone, the evidence of record does not show unexpected superiority over the Braun stabilizers *as a class*. Cf. In re Whiton, 57 CCPA, 420 F.2d 1082 (1970), where the appellant did make such a showing.

Since the existence of a degradation problem was apparent, its solution suggested by the prior art, and no satisfactory proof of unexpected results has been submitted, we must conclude that the claimed subject matter as a whole would have been obvious.

The decision of the board is affirmed.

Affirmed.